IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| VIRGIL GAMBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:15-cv-00496 |
| v. | ) | |
| | ) | Judge Campbell |
| JP MORGAN CHASE & COMPANY, and | ) | Magistrate Judge Holmes |
| J.P. MORGAN SECURITIES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Virgil Gamble, worked for JPMorgan Chase Bank, N.A. (the "Bank"), as a Financial Advisor in San Francisco, California. On August 15, 2011, Plaintiff suffered a heart attack (his third) and underwent an emergency angioplasty. That day, Plaintiff began a leave of absence from his position that would ultimately last for two years. The Bank granted Plaintiff six months of paid short-term disability leave, fifteen more months of leave while he received long-term disability benefits from the Bank's LTD insurance carrier, Prudential, and then an additional three months of leave after his LTD benefits had expired. By August 2013, Plaintiff had been absent from his job for a full two years, had not been released by his cardiologist to return to the workforce, and had given the Bank no indication if or when he ever intended to work again. In August and September 2013, the Bank made multiple attempts to communicate with Plaintiff regarding his health status and intentions return to work, but Plaintiff ignored those communications. Not surprisingly, the Bank terminated Plaintiff's employment.

Plaintiff now brings this lawsuit claiming his termination was discriminatory on the basis of his age and disability in violation of the Age Discrimination in Employment Act ("ADEA")

1

and Americans with Disabilities Act ("ADA"). Plaintiff's claims against the Defendants fail for several, independently sufficient reasons and must be dismissed. First, Plaintiff cannot establish a *prima facie* case of age or disability discrimination because he was physically unable to work and had not been released by his cardiologist to return to work at the time his employment was terminated. In fact, Plaintiff admits he is permanently disabled and unable to work even today. Under Sixth Circuit law, Plaintiff's inability to work means he cannot meet the qualification element of his age or disability discrimination claims. Second, Plaintiff testified the only reason he believes his termination was motivated by his age or disability is the fact that the Bank did not attempt to place him in another position within the company prior to discharging him. This reasoning, even if true, is insufficient as a matter of law to prove that the Bank terminated Plaintiff because of his age or disability. In any event, Plaintiff did not ask the Bank to allow him to return to work in another position, the only job he thinks he could perform is serving as an expert witness in the field of securities (something he has never done), and he is not aware if the Bank employs expert witnesses or if Defendants had any such positions available. Thus, Plaintiff cannot satisfy the causation element of his age or disability discrimination claims. Third, Plaintiff's failure to communicate with the Bank regarding his health status and return to work after two years of leave was a legitimate, nondiscriminatory reason for the Bank to terminate him, and Plaintiff cannot prove that reason was pretextual.

Plaintiff's lawsuit also complains that various other occurrences from his employment constitute age and disability discrimination. However, each of those claims fail because the undisputed, material facts establish that Plaintiff did not make them the part of a timely charge of discrimination filed with the EEOC and/or the THRC. Summary judgment should be granted based on Plaintiff's failure to timely exhaust his administrative remedies prior to instituting this

ADEA and ADA litigation. Moreover, Plaintiff cannot establish that his claims against JP Morgan constitute actionable age or disability discrimination, even if they were timely.

## FACTUAL SUMMARY

**I.      Plaintiff's employment with the Bank as a Financial Advisor.**

The Bank employed Plaintiff as a Financial Advisor in San Francisco, California.[1] Statement of Undisputed, Material Facts in Support of Defendants' Motion for Summary Judgment ("SUMF"), ¶ 1. Plaintiff, a self-described "stockbroker," managed client assets and provided investment advice to the Bank's customers. *Id.*, ¶ 5

Between December 2009 and July 2011, Plaintiff was involved in four automobile accidents, which left Plaintiff with physical injuries to the right side of his body, including his foot, knee, hip, and shoulder. *Id.*, ¶¶ 10, 11. Because of his physical impairments, Plaintiff was only able to work part-time and could not do the things necessary to develop business and grow the client assets that he managed. *Id.*, ¶ 12.

On July 1, 2011, David Jernigan became branch manager of the Bank's San Francisco office where Plaintiff worked.[2] *Id.*, ¶ 7-8. Plaintiff alleges that "several times" Jernigan made a joke about Plaintiff's use of a knee scooter in the presence of Plaintiff and his colleagues. *Id.*, ¶¶ 13, 14.[3] On Friday, April 12, 2011, Jernigan called Plaintiff to his office while he was conducting "get to know you" meetings with the San Francisco employees. *Id.*, ¶ 17. During the meeting, Jernigan advised Plaintiff that he needed to grow his client assets. *Id.* Plaintiff responded that he could not do the client development work necessary to raise additional assets, which prompted Jernigan to state he thought Plaintiff should resign from his position. *Id.*, ¶ 18.

---

[1] Plaintiff was not employed by either named Defendant.  Instead, he was employed by JPMorgan Chase Bank, N.A.
[2] Plaintiff and Jernigan would only work together for five or six weeks, and Mr. Jernigan was in New York for "at least a couple" of those weeks. SUMF, ¶ 9.
[3] Although Plaintiff took offense to the joke, he did not report it to JP Morgan's human resources. SUMF, ¶ 15.

3

When Plaintiff said he would not resign, Jernigan allegedly told Plaintiff, "I am not going to run you off," but that he should take the weekend to consider resignation. *Id.*, ¶ 19.

## II.    Plaintiff suffers a cardiac emergency, undergoes surgery, and begins a two year leave of absence.

On or about August 15, 2011, Plaintiff experienced a cardiac emergency and underwent an angioplasty procedure to insert a stent into his heart.[4] *Id.*, ¶¶ 23, 24. Plaintiff went on leave from his position beginning that day. *Id.*, ¶ 25. On August 24, 2011, Plaintiff's cardiologist, Dr. Raymond Erny, sent a letter to the Bank stating that "at this time I have advised [Plaintiff] not to return to his position with JP Morgan Securities, and to do take a disability leave given his current cardiac condition." *Id.*, ¶ 29. On August 29, 2011, Plaintiff also provided the Bank with a medical certification from Dr. Erny stating that Plaintiff would be physically unable to work for the period of August 15, 2011 to February 15, 2012. *Id.*, ¶ 30.

Plaintiff applied for paid STD leave under the Bank's Disability Leave Policy related to his cardiac condition. *Id.*, ¶¶ 31, 34. On September 16, 2011, the Bank's Disability Management Services approved Plaintiff's STD leave and benefits for the period of August 15, 2011 through November 7, 2011. *Id.*, ¶ 34. The Bank later extended Plaintiff's STD leave and benefits through February 13, 2012. *Id.*, ¶ 37. Plaintiff remained on STD leave until February 13, 2012, when he exhausted the maximum 26 weeks of leave under the Bank's Disability Leave Policy. *Id.*, ¶ 38.

Plaintiff was insured under a long-term disability policy purchased from The Prudential Insurance Company of America ("Prudential"). *Id.*, ¶ 33. In or around January 2012, Plaintiff applied for LTD benefits through Prudential. *Id.*, ¶ 43. Prudential reviewed and approved Plaintiff's LTD claim and paid him monthly LTD benefits from February 13, 2012 through May 12, 2013. *Id.*, ¶ 44. On May 12, 2013, Plaintiff's LTD benefits ended as Prudential had paid

---

[4] Plaintiff had suffered two prior heart attacks in October 1989 and February 2006. SUMF, ¶ 28.

4

Plaintiff 15 months of LTD, the maximum benefit owed him under the terms of the LTD policy. *Id.*, ¶¶ 91, 97. However, Plaintiff remained on leave from work.

## III. Plaintiff Does Not Respond to the Bank's Inquiries Regarding His Employment Status

By August 2013, Plaintiff had been out of work for two full years. *Id.*, ¶¶ 25, 37, 42, 44, 63. On August 14, 2013, Jennifer Smith, a Vice President and Human Resources Business Partner, sent a letter to Plaintiff regarding his leave status and intentions to return to work. *Id.*, ¶ 63. Smith notified Plaintiff in the letter that if he did not contact her by August 27, 2013, the Bank would assume he did not intend to return to work and process the termination of his employment. *Id.* Plaintiff provided the letter to his legal counsel, but neither Plaintiff nor his attorney responded to Ms. Smith. *Id.*, ¶¶ 64, 65. On September 4, 2013, Jennifer Smith sent another, "final" letter to Plaintiff regarding his leave status and intentions to return to work. *Id.*, ¶ 66. Therein, Smith apprised Plaintiff that unless he contacted the Bank by September 6th, it would assume he was not returning to work and terminate him. *Id.* Plaintiff again provided the letter to his counsel, but neither responded. *Id.*, ¶¶ 67, 68. Smith also attempted to contact Plaintiff by telephone, but her calls went unreturned. *Id.*, ¶ 69. Not knowing when or if Plaintiff ever intended to return to work, the Bank terminated his employment on September 9, 2013. *Id.*, ¶ 70.

## IV. Plaintiff's Decision Not to Return to Work

Although Plaintiff was allowed to remain on leave status until September 9, 2013, he had decided not return to work with the Bank long before. *Id.*, ¶ 47. Following the angioplasty on August 15, 2011, Plaintiff's cardiologist advised Plaintiff to "give up" his job with the Bank because of his cardiac condition and the stress of the job. *Id.*, ¶ 45. At some point during his six months of STD leave from August 15, 2011 to February 15, 2012, Plaintiff made a final decision

that it was in the best interests for his health not to return to his position with the Bank. *Id.*, ¶ 47. Plaintiff further admits that he remains completely disabled and unable to work at the present day. [5] *Id.*, ¶ 49. When asked if there any jobs that he could perform within the restrictions of his cardiologist, Plaintiff thought he might be able to serve as an expert witness in the securities industry. *Id.*, ¶ 72, 146. Before he was terminated, Plaintiff did not ask the Bank to give him a job as an expert witness, or any other job for that matter. *Id.*, ¶ 75. Plaintiff also does not know if the Bank employs in-house expert witnesses, or if any such positions were available. *Id.*, ¶ 74.

## LAW AND ARGUMENT

**I.    Plaintiff's Age and Disability Discrimination Claims Related to His Termination Fail as a Matter of Law.**

Through this action, Plaintiff alleges that the termination of his employment constituted age and disability discrimination in violation of the ADEA and ADA. Plaintiff has not identified any direct evidence that he was terminated due to age or disability. *Id.*, ¶¶ 128-131. Thus, he must proceed using indirect, circumstantial evidence.

Under both the ADEA and the ADA, Plaintiff bears the initial burden of identifying evidence that would establish a *prima facie* case of discrimination. *See, e.g.*, *Evans v. Vanderbilt Univ. Med. Ctr.*, 2016 WL 128525, at *4 (M.D. Tenn. Jan. 12, 2016) (ADEA); *Rader v. Upper Cumberland Human Res. Agency*, 2016 WL 1118211, at *4 (M.D. Tenn. Mar. 22, 2016) (ADA). To make out a *prima facie* case of age discrimination, Plaintiff must show that he was: (1) 40 years of age or older at the time of the alleged discrimination; (2) subjected to an adverse employment action; (3) otherwise qualified for the position; and (4) replaced by a younger worker, or that similarly situated employees were treated more favorably. *Evans*, 2016 WL

---

[5] Also underscoring Plaintiff's decision that he would not return to work for the Bank is the fact that Plaintiff relocated from Tiburon, California to Nashville, Tennessee in May 2012. Plaintiff states he moved to Tennessee from California for the lower cost of living and lower taxation. *Id.*, ¶¶ 61, 62.

6

128525, at *4 (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007); *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 511 (6th Cir. 2004)). Similarly, to establish a *prima facie* case of disability discrimination, Plaintiff must show that he was: (1) disabled within the meaning of the ADA; (2) otherwise qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) suffered an adverse employment action because of a disability. *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 (6th Cir. 2013). Defendants are entitled to summary judgment because Plaintiff cannot present a *prima facie* case of discrimination under either statute.

### A. Plaintiff Was Unqualified for His Position Because He Was Medically Unable to Perform the Functions of the Job.

Under both the ADA and the ADEA, Plaintiff must prove his qualification for the position as a part of his *prima facie* case. Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In the ADEA context, courts define a qualified individual as one who was qualified for his position and was satisfactorily performing his job at a level that met his employer's expectations. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). Under either statute, an employee is not qualified when he is incapable of performing the essential functions of the position he holds. *See Hart v. Ridge Tool Co.*, 544 F. Supp. 2d 634, 643-44 (N.D. Ohio 2008) (plaintiff's inability to drive prevented him from performing essential functions of sales position and made him unqualified for both ADA and ADEA purposes).

Plaintiff's claims for age and disability discrimination fail as a matter of law because Plaintiff was physically unable to work and had not been released by his doctor to return to work at the time he was terminated. This legal principle was recognized by the Sixth Circuit in *Gantt*

7

*v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir. 1998), and a number of decisions that have followed it. In *Gantt*, the plaintiff employee underwent rotator cuff surgery to repair an on-the-job shoulder injury. 143 F.3d at 1044. Gantt advised her employer that she would be off work for six weeks to one year and thereafter began a medical leave absence. *Id.* As the end of Gantt's one year leave of absence approached, the defendant employer contacted Gantt to ask when she would be returning to work. *Id.* at 1045. Gantt responded she would return as soon as her doctor released her, but she had no idea when that would occur, or what her limitations would be. *Id.* Consequently, the employer terminated Gantt's employment for failure to return to her employment within one year of the commencement of her leave of absence. *Id.*

Following her termination, Gantt brought suit alleging that her employer's actions were discriminatory on the basis of her age and disability in violation of the ADEA and ADA. *Id.* at 1045. Gantt asserted several theories of disability discrimination, including that the employer's decision to terminate her employment after one year of leave constituted disparate treatment. The district court granted summary judgment on the basis that the plaintiff was not "qualified" for the position in question, and the Sixth Circuit affirmed on appeal. The appeals court explained its reasoning as follows:

> There is no dispute that Plaintiff was a disabled person. Nevertheless, because she was not released by her doctor to return to work, she has not met the second requirement that she be qualified to perform the essential functions of the job. "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."
>
> When Plaintiff was called after failing to come to work for an entire year she gave no indication as to when she would be able to return to work. There is no question of fact that Plaintiff was not qualified for the position at the time of her termination. Accordingly, she has failed to make out a prima facie case and is entitled to no protection under the ADA.

8

*Id.* at 1047 (citations omitted). The court also affirmed summary judgment as to Gantt's ADEA claim, finding that the employer's termination of Gantt under its leave of absence policy was not discriminatory on the basis of her age. *Id.* at 1048.

Following the rationale in *Gantt*, the Sixth Circuit held in *Anderson v. Inland Paperboard & Packaging, Inc.*, 11 F. App'x 432, 438 (6th Cir. 2001) that an employer's termination of its employee, who had been injured in motorcycle accident, prior to her physician's medical release, did not violate ADA because the employee was unable to perform her duties as a storeroom clerk at time of termination and thus could not satisfy her *prima facie* case. Likewise, this Court and other district courts within the Sixth Circuit have consistently held that an employee who is medically unable to work and/or has not been released by his doctor to return to work from a medical leave is not "qualified" for the employee's position. *See Allen v. Bellsouth Telecomms., Inc.*, 2011 WL 1842860, at *10 (M.D. Tenn. May 12, 2011) (holding that an employee was has not been released by her doctors to return to work following a medical leave of absence was not "otherwise qualified" for her position); *Pagel v. Premier Mfg. Support Servs., Inc.*, 2005 WL 1785178, at *8 (M.D. Tenn. July 21, 2005) ("An employee who suffers an injury or illness and is not medically to return to work is not 'qualified' under the ADA.").[6]

In the present matter, Plaintiff's admissions undisputedly establish that he cannot meet the qualification element because he was medically unable to work at the time of his termination. Plaintiff's leave of absence began on August 15, 2011, the date that he had an angioplasty to

---

[6] *See also Hart*, 544 F. Supp. 2d at 642-43 (granting summary judgment to employer on ADEA and ADA discrimination claims where a medical condition prevented plaintiff from performing his essential job functions and plaintiff was terminated upon exhaustion of his medical leave); *Schroeder v. Schroeder*, 2005 WL 1389217, at *3 (N.D. Ohio June 13, 2005) ("To fulfill the requirement that a plaintiff be able to perform the essential functions of his job, there must be some indication that the plaintiff was prepared to return to work at the time he was fired."); *Roberson v. Cendant Travel Servs., Inc.*, 252 F. Supp. 2d 573, 582 (M.D. Tenn. 2002) ("Since Plaintiff still has not been released to work, she is not 'qualified' under the ADA.").

9

treat his cardiac event. SUMF, ¶¶ 23-25. Following the angioplasty, Plaintiff's cardiologist, Dr. Raymond Erny, advised Plaintiff that he should not return to his position for medical reasons, and Dr. Erny conveyed that recommendation to the Bank. *Id.*, ¶ 29. The Bank granted Plaintiff six months of short-term disability leave from August 15, 2011 to February 13, 2012, and during those six months, Plaintiff made a final decision that he would not return to work. *Id.*, ¶ 47.

Plaintiff admits that he did not intend to come back to his position when his employment ended. *Id.*, ¶ 71. Plaintiff also concedes he had not been released by Dr. Erny and was medically unable to work when the Bank processed his termination in September 2013.[7] *Id.*, ¶ 71. In fact, Plaintiff remains unable to work under the orders of Dr. Erny at present date. *Id.*, ¶¶ 48, 49, 144, 145.

Even if Plaintiff's concessions in the case were not enough (and they are), Plaintiff made a number of fatal admissions regarding his ability to work in a consolidated lawsuit that he filed in the Superior Court for Marin County, California in connection with his four automobile accidents. Plaintiff was deposed in connection with that lawsuit in April 2012 and testified that he was permanently disabled from working due to his heart condition:

> Q.      Are you still working for J. P. Morgan Securities?
> A.      Technically, no.
> Q.      Why do you qualify that with "technically"?
> A.      I am totally disabled; but during the disability period, I'm still considered an active employee for a period of time.
> Q.      What is the nature of the disability that prevents you from working now?
> A.      Heart disease.

*Id.*, ¶ 152. Plaintiff further admitted during his deposition as follows:

---

[7] Plaintiff erroneously believes that he was terminated in December 2012, when JP Morgan Securities LLC ("JPMS") filed a Form U5 with the Financial Industry Regulatory Authority (FINRA) to terminate his securities license due to him not completing continuing education requirements during his leave of absence. SUMF, ¶¶ 55, 56, 59. The termination of Plaintiff's securities license did not terminate his employment. *Id.*, ¶ 60. Even if Plaintiff's employment came to an end in December 2012, Plaintiff had not been released to return to work by Dr. Erny and he was medically unable to work at that time. *Id.*, ¶ 71. Thus, Plaintiff was also "unqualified" in December 2012.

> Q. Did Dr. Erny or any other health professional tell you you could not return to work after August 15, 2011?
> A. Dr. Erny.
> Q. As far as you know, will your cardiological condition permanently disable you from work?
> A. Yes.

*Id.*, ¶ 153. Plaintiff also provided sworn answers to interrogatories on March 15, 2013, wherein he admitted that he "was no longer participating in the workforce" and that he was totally disabled and would be unable to work in future. *Id.*, ¶ 135.

The overwhelming evidence firmly establishes that Plaintiff was medically unable to return to work with JP Morgan at the time of his termination, and he remains unable to work today. Under Sixth Circuit law, the only conclusion that can be reached is that Plaintiff was not qualified for his position and thus cannot establish a *prima facie* case of age or disability discrimination. *See Gantt*, 143 F.3d at 1044; *Anderson*, 11 F. App'x at 438; *Allen*, 2011 WL 1842860, at *10; *Pagel*, 2005 WL 1785178, at *8; *Hart*, 544 F. Supp. 2d at 642-43; *Schroeder*, 2005 WL 1389217, at *3; *Roberson*, 252 F. Supp. at 582. JP Morgan is entitled to summary judgment.

### B. Plaintiff Cannot Establish that the Bank Terminated Him Because of His Age or Disability.

Even if Plaintiff could prove his "qualification" for the job, Defendants are still entitled to summary judgment because Plaintiff cannot present evidence from which the trier of fact could find that he was terminated because of his age or disability.

When asked during his deposition to articulate why he believes his termination was based on his age or disability, Plaintiff offered only that "JP Morgan arbitrarily terminated [his] employment [in] December 2012" and "they never came back to [him] and made any attempt whatsoever to accommodate [his] disability, any other form within a giant corporation like that."

SUMF, ¶ 129. When asked if there was any other reason why he thought his termination was age or disability-related, Plaintiff again testified:

> A    Well, the fact that they never offered me any other form of employment. They never engaged me. Hey, look, prior to them terminating me in December 2012, we have thousands and thousands of other jobs at this company we could offer you that would accommodate your disability and your age. They never did.
> Q    Did you ever ask them for another job in the company?
> A    Andy [Allman] did. Andy didn't specifically ask them for any other job. But at that point, I had already turned it over to Andy because he was handling all communications.

*Id.*, ¶ 130. Thus, Plaintiff's sole reason for believing he was terminated due to his age and disability is the fact that the Bank did not attempt to place him in some other position within the company prior to ending his employment. *Id.*, ¶ 131.

As an initial matter, Plaintiff's purported proof does not establish a *prima facie* case of age discrimination under the ADEA. The ADEA requires Plaintiff to show that he was replaced by a younger worker or that similarly situated employees were treated more favorably. *Evans*, 2016 WL 128525, at *4 (citing *Tuttle*, 474 F.3d at 317; *Coomer*, 370 F.3d at 511). Plaintiff's simple claim that he should have been placed in another position is insufficient as a matter of law to prove that the termination of his employment was motivated by his age.

With regard to the ADA, Plaintiff's argument is that essentially that the Bank failed to reasonably accommodate his heart condition by placing him in alternative position. Notwithstanding the fact that Plaintiff did not allege a failure to accommodate claim in his Complaint, his reasonable accommodation theory fails as a matter of law. "Generally, an ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (*Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)). When

12

the requested accommodation is a job transfer, the "plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id.*; s*ee also Cash v. Siegel-Robert, Inc.*, 548 F. App'x 330, 335 (6th Cir. 2013).

Plaintiff admits that he had turned the matter over to his counsel, who did not specifically request that he be placed in another job. SUMF, ¶ 64. Defendants are not aware of any request from Plaintiff to place him in another position so that he could return to work. *Id.*, ¶ 68, 75. Moreover, Plaintiff's claim that there were "thousands and thousands" of jobs that Defendants could have placed him in is belied by his own testimony. When asked what jobs he could perform in conformity with his doctor's instructions, Plaintiff responded that "[t]he only think [he] could think have would maybe being an expert witness in the securities industry." *Id.*, ¶ 72. However, Plaintiff has never served as an expert witness before. *Id.*, ¶ 73. Plaintiff also does not know whether Defendants employ expert witnesses or whether it has any of those jobs available. *Id.*, ¶ 74. Thus, Plaintiff cannot establish that he requested another position with any Defendant, that either Defendant had other available positions that it could have placed him in, or that he was qualified for those positions.

### C.      The Bank Had a Legitimate, Nondiscriminatory, and Nonpretextual Reason to End Plaintiff's Employment.

Even assuming, *arguendo*, Plaintiff could present a *prima facie* case of age or disability discrimination, JP Morgan had a legitimate, nondiscriminatory, and nonpretextual reason for ending Plaintiff's employment. Plaintiff failed to respond to the Bank's multiple attempts to communicate with Plaintiff regarding his medical status and intentions of returning work.

On August 14, 2013, Jennifer Smith sent a letter to Plaintiff stating that JP Morgan's records showed that his LTD benefits ended on May 14, 2013 and that he was out of work on an unapproved leave. *Id.*, ¶ 63. Smith asked Plaintiff to contact her by August 27, 2013, if he

intended to return to work. *Id.* Smith also advised that Plaintiff would be terminated if he did not contact the Bank to discuss his status. *Id.* Plaintiff did not respond. *Id.*, ¶ 65. On September 4, 2013, Jennifer Smith sent Plaintiff a second and "final" letter regarding his leave status and intentions to return to work. *Id.*, ¶ 66. She also attempted to contact Plaintiff by telephone. *Id.*, ¶ 69. Again, Plaintiff did not respond to Smith's final letter or to her telephone calls. *Id.*, ¶ 68.

The Bank allowed Plaintiff to be out of work for a full two years, far longer than any law requires. *Id.*, ¶¶ 25, 37, 44, 63. Although the Bank attempted to communicate with Plaintiff regarding his intent to return to work, Plaintiff did not respond to those communications.[8] *Id.*, ¶¶ 65, 68. Thus, the Bank terminated Plaintiff's employment on September 9, 2013 for failure to return to work. *Id.*, ¶ 70. In the Sixth Circuit, an employee who fails to return to work following leave is considered to have abandoned his or her job, and job abandonment is a legitimate, nondiscriminatory basis for termination. *See Barrett v. Lucent Technologies, Inc.*, 36 F. App'x 835, 843 (6th Cir. 2002) ("The undisputed fact is that plaintiff simply failed to return to work, and this was a legitimate, nondiscriminatory reason for terminating plaintiff's employment.").[9] Here, summary judgment should be entered for Defendants because the basis for Plaintiff's termination was both legitimate and nondiscriminatory, and Plaintiff cannot prove that reason was a pretext for unlawful age or disability discrimination.

---

[8] The fact that Plaintiff did not communicate whether he intended to return to work is perhaps not surprising. Plaintiff admits that he made a final decision that it was in the best interests for his health that he not work as a stockbroker again during the six months that he was on STD leave from August 2011 to February 2012. SUMF, ¶ 47. Then, in May 2012, Plaintiff relocated from the San Francisco area to Nashville, Tennessee to enjoy the area's lower cost of living and lower taxation. SUMF, ¶¶ 61-62.

[9] *See also Payne v. Mueller Indus., Inc.*, 2013 WL 3864818, at *5 (W.D. Tenn. July 24, 2013) (granting summary judgment to defendant employer where the plaintiff was terminated for failing to communicate with defendant regarding her lengthy absence from work); *Holleman v. BellSouth Telecomms., Inc.*, 2011 WL 3876590, at *12-14 (E.D. Tenn. Sept. 1, 2011) (holding that plaintiff's failure to return to work after defendant denied her short-term disability leave constituted job abandonment and was a legitimate, nondiscriminatory basis for termination); *Richardson v. CVS Corp.*, 207 F. Supp. 2d 733, 745 (E.D. Tenn. 2001) (employee's termination for perceived job abandonment was legitimate, nondiscriminatory, and nonpretextual).

14

**D.    Plaintiff Cannot Use His Deposition Errata Sheet to Change Substantive Answers and Avoid Damaging Testimony.**

Apparently recognizing that his deposition testimony is not favorable for his case, Plaintiff completed a deposition errata sheet that attempts to delete large portions of his testimony. *See* Errata Sheet to Pl. Dep. Specifically, Plaintiff contends that he misunderstood the source of Exhibits 13 and 14 to his deposition – the August 14, 2013 and September 4, 2013 letters from Jennifer Smith to Plaintiff – and thought that he produced those documents in response to Defendants' written discovery requests. *Id.* Plaintiff purports he could not find those letters in his personal files when returning home from the deposition. *Id.* Thus, he attempts to delete portions of his deposition that related to JP Morgan's attempts to contact him in August and September 2013.

Federal Rule of Civil Procedure 30(e), as interpreted by the Sixth Circuit, does not permit a deponent to engage in this type of shenanigan. Instead, a deponent can only use his errata sheet to correct typographical errors by the court reporter; substantive changes to the deponent's testimony are not permitted. *See Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560, 565 (6th Cir. 2009) ("Rule 30(e) does not allow one to alter what was said under oath."); *Clare v. Chrysler Group, LLC*, 2014 WL 2515212 (E.D. Mich. June 4, 2014) ("[*Trout*] stated that [the Sixth Circuit] prohibits any type of material alterations to a deposition transcript and only allows a party to use Rule 30(e) to correct a typographical error.").[10] The reason for this rule was aptly

---

[10] See also *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt.*, LLC, 2014 WL 1744848, at *2-4 (E.D. Ky. Apr. 30, 2014) (striking an errata sheet that attempted to make substantive changes to the deponent's sworn testimony); *EEOC v. Skanska USA Building, Inc.*, 278 F.R.D. 407, 410–12 (W.D. Tenn. 2012) (holding that an employer could not, by way of an errata sheet, change its corporate designee's responses to two deposition questions from "Yes" to "No"). *But see Buchanan v. City of Mt. Juliet*, 2012 U.S. Dist. LEXIS 137999, at *3 (M.D. Tenn. Sept. 26, 2012) (denying defendant's motion to strike the plaintiff's errata sheet, but declining to reach the issue of whether the errata sheet changes would be allowed for the purpose of defeating a motion for summary judgment).

15

explained in the frequently-cited decision of *Greenway v. International Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992):

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

Plaintiff's fraudulent attempt to use the errata sheet to escape his deposition admissions highlights what the record already makes plain – the Bank made multiple, good faith attempts to communicate with Plaintiff regarding whether he intended to return to work. Plaintiff ignored those communications, thereby abandoning his employment. Plaintiff's claims fail.

## II. Plaintiff's Remaining Claims Are Barred for Failure to Timely Exhaust His Administrative Remedies.

In addition to his termination, Plaintiff's contends that a variety of other events from his employment with the Bank were discriminatory on the basis of his age and disability. Defendants are entitled to summary judgment because Plaintiff failed to timely exhaust his administrative remedies as to these remaining allegations.

The law concerning administrative exhaustion is well-settled. Before filing a lawsuit under the ADEA or ADA, a plaintiff first must file a timely charge of discrimination with the EEOC or an equivalent state agency. *See, e.g., Mitchell v. Chapman,* 343 F.3d 811, 819-20 (6th Cir. 2003) ("It is well-established that a party's exhaustion of administrative processes for filing a claim of discrimination is a condition precedent to filing suit in the district court"). In deferral states such as Tennessee, the time limitation for filing a charge of discrimination is 300 days

"after the alleged unlawful employment practice occurred." *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d); 42 U.S.C. § 12117(a); *Hoover v. Timken Co.*, 30 F. App'x 511, 513 (6th Cir. 2002) ("To exhaust administrative remedies under the ADA or ADEA, a plaintiff must file an EEOC charge within 180 days of the alleged discrimination (or with the state agency within 300 days)."). An alleged discriminatory act that is not made the basis of a timely administrative charge "is merely an unfortunate event in history with no present legal consequences." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 (1977); *see also Hoover*, 30 F. App'x at 513 ("Failure to timely exhaust administrative remedies is an appropriate basis for dismissal of an ADA or ADEA action.").

Here, Plaintiff failed to timely exhaust his administrative remedies before filing the present lawsuit because (1) except for Plaintiff's termination, the alleged discriminatory acts identified in Plaintiff's Complaint occurred more than 300 days before Plaintiff's September 2013 Charge; and (2) the alleged discriminatory acts identified in Plaintiff's Complaint exceed the scope of his Charge.

### A. Plaintiff's September 2013 Charge Was Untimely.

Plaintiff dual-filed his Charge with the Nashville Area Office of the EEOC and with the THRC on September 24, 2013. SUMF, ¶ 155. Any claims arising from actions that occurred more than 300 days before September 24, 2013 are time-barred by the ADA and ADEA's statute of limitations. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375-76 (6th Cir. 2002) ("[A] plaintiff's ADEA claim will be dismissed as untimely if the plaintiff fails to file a charge within 300 days of the discriminatory action."); *Aziz v. Dollar Tree Stores, Inc.*, 2005 WL 2290593, at *8 (E.D. Tenn. Sept. 20, 2005) (granting summary judgment as to all claims of

17

discrimination that arose from actions occurring more than 300 days prior to the plaintiff's EEOC charge).

Plaintiff's lawsuit complains of a litany of conduct that occurred much more than 300 days before the date of Plaintiff's Charge. Those time-barred claims include:

- Prior to the beginning of his medical leave on August 15, 2011, David Jernigan made derogatory comments regarding his medical condition (particularly his knee scooter) in the presence of co-workers. SUMF, ¶¶ 8, 9, 13.

- JP Morgan made STD payments to Plaintiff for the period of August 15, 2011 through February 12, 2012. Plaintiff claims the Bank incorrectly calculated the amount of those payments using his monthly draw as opposed to his total pay, including commissions. *Id.*, ¶¶ 31, 34, 37, 78, 80, 81.

- In September 2011, David Jernigan informed Plaintiff that his client accounts were being reassigned to another broker, Frank Villareal, and that the Bank would pay Plaintiff fifty percent of the commissions earned from those accounts for a period of one year. *Id.*, ¶ 100, 101. The fifty percent commission payments ended in May 2012, and Plaintiff contends they should have been made until September 2012. *Id.*, ¶ 103.

- On or about May 30, 2012, the Bank informed Plaintiff that his retention loan payment was past due, but the loan was supposed to be forgiven in the event of disability or death. *Id.*, ¶ 116.

- In June 2012, Plaintiff did not receive an annual retention bonus. *Id.*, ¶ 119.

Even if Plaintiff had evidence to suggest that the above-referenced actions were discriminatory on the basis of Plaintiff's age or alleged disability (and he does not), Plaintiff is time-barred from litigating those actions because each occurred more than 300 days prior to the

18

filing of Plaintiff's Charge on September 24, 2013. *Weigel*, 302 F.3d at 375-76; *Aziz*, 2005 WL 2290593, at *8. Summary judgment should be granted to JP Morgan as to each of the above-referenced claims.

### B. Plaintiff's Lawsuit Exceeds the Scope of His Charge.

Moreover, even if Plaintiff had filed his Charge timely, the claims contained in Plaintiff's lawsuit exceed the scope of his EEOC Charge. A critical component to the administrative exhaustion requirement is that the Plaintiff give notice of his claims in the charge. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). "The charge must be 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" *Id.* (quoting 29 C.F.R. § 1601.12(b)). This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion.[11] *Younis*, 610 F.3d at 361. Allowing an ADA and ADEA action to encompass claims not included in the EEOC Charge would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role. Thus, "[c]laims not included in the charge may not be brought in a subsequently filed action." *Dunn v. Chattanooga Pub. Co.*, 993 F. Supp. 2d 830, 841 (E.D. Tenn. 2014) (citing *Johnson v. Cleveland City School Dist.*, 344 F. App'x 104, 109 (6th Cir. 2009)).

In this matter, Plaintiff's submitted a Charge that alleged only that JP Morgan terminated him while he was on long term disability. SUMF, ¶ 158. The charge checked the boxes for age and disability discrimination and alleged as follows when stating the particulars:

> I was hired by JP Morgan Chase and Company [in] October 1995.
> In August 2011, I went on leave for disability. JP Morgan Chase
> and Company employs more than 15 employees.

---

[11] Plaintiff was represented by counsel at the time he filed his charge with the EEOC. SUMF, ¶ 151.

> I was terminated on December 19, 2012. I was still on long term disability when I was terminated. Other younger employees have been on disability and were not terminated but provided other job opportunities and assignments to accommodate their medical restrictions.
>
> Therefore, I believe I have been discriminated against because of age, in violation of the Age Discrimination in Employment Act and the ADAAA.

*Id.*, ¶¶ 157-158. Plaintiff also submitted an EEOC Intake Questionnaire and attached a narrative of the actions that he viewed to be discriminatory. *Id.*, ¶ 159.

Plaintiff includes two claims in this lawsuit that he omitted entirely from his EEOC Charge and EEOC Intake Questionnaire. First, Plaintiff's contention that David Jernigan made derogatory comments regarding his medical condition and use of a knee scooter were wholly absent from the EEOC Charge and EEOC Intake Questionnaire. *Id.*, ¶¶ 13, 158, 159. By omitting this alleged harassment at the administrative phase, Plaintiff failed to exhaust any claim for a hostile work environment. *Younis*, 610 F.3d at 362 ("[I]nclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion."); *see also Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 627 (6th Cir. 2013) (same). Second, Plaintiff also now claims that Defendants are somehow legally responsible for the fact that his LTD benefits from Prudential ended in May 2013. SUMF, ¶¶ 91-94. Again, Plaintiff made no effort to include this alleged act in his charge. *Id.*, ¶¶ 158, 159. As such, Defendants are entitled to summary judgment for Plaintiff's failure to exhaust administrative remedies. *See, e.g.*, *Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 2015 WL 3971846, at *3 (M.D. Tenn. June 30, 2015) (granting summary judgment as to discrete acts of discrimination that plaintiff omitted from his administrative charge).

**III.  Plaintiff's Claim of Harassment Fails as a Matter of Law.**

Even if Plaintiff had administratively exhausted his claim for harassment, the treatment that Plaintiff complains of does not meet the "severe or pervasive" test under applicable case law so as to give rise to an actionable hostile work environment claim. To prevail on a claim of harassment under the ADA, a plaintiff must establish that (1) he was disabled; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures. *See Handshoe v. Mercy Med. Ctr.*, 34 F. App'x 441, 448 (6th Cir. 2002) (citations omitted). The ADEA contains similar elements, except the plaintiff must prove he was 40 years or older and that he endured harassment based on age. *See Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 835 (6th Cir. 1996); *see also Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 471 (6th Cir. 2014).

Harassment is only actionable when it was sufficiently severe and pervasive to alter the conditions of one's employment and create an abusive working environment. *Handshoe*, 34 F. App'x at 448 (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)); *Crawford*, 96 F.3d at 835. "Conduct that is 'merely offensive' does not rise to the level of that which will support a claim of hostile work environment." *Wheeler v. Jackson Nat'l Life Ins. Co.*, No. 3:14-CV-0913, 2016 WL 427796, at *21 (M.D. Tenn. Jan. 4, 2016). "The court must look at the totality of the circumstances, considering the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Handshoe*, 34 F. App'x at 448.

Here, Plaintiff alleges that David Jernigan made jokes about his physical condition and use of a knee scooter, which he found offensive. SUMF, ¶ 13. When asked during his deposition what comments Jernigan made that Plaintiff took offense to, Plaintiff stated:

> [Jernigan] would see me coming down the hallway on my scooter and he would make some kind of crack about it. The words I don't remember. But other people heard it. I know – I can remember precisely in one time in our weekly meeting when he came into the meeting with a room full of people, he made some other kind of derogatory crack about it and everybody laughs about it.

*Id.*, ¶ 13. Plaintiff did not know how many times Jernigan made a joke about his scooter, but it was "several times." *Id.*, ¶ 14. Jernigan did not call Plaintiff any names related to his physical condition, and he did not make any other jokes that Plaintiff took offense to. *Id.*, ¶ 16.

The alleged comments by Jernigan pertain to Plaintiff's physical limitations, not his age, meaning that his hostile work environment claim falls within the scope of the ADA, not the ADEA. Regardless of which statute applies, however, these comments do not rise to the level of a hostile work environment. *See, e.g.*, *Batuyong v. Gates*, 337 F. App'x 451, 457 (6th Cir. 2009) (holding that supervisor who "raised his voice, inappropriately, became verbally abusive, and chastised [plaintiff] in front of others" did not create hostile work environment); *Goller v. Ohio Dep't of Rehab. & Corr.*, 285 F. App'x 250 (6th Cir. 2008) (finding that supervisor's derogatory name calling was insufficient to establish hostile work environment, especially where the plaintiff did not produce any evidence that it was sufficiently severe or threatening to interfere with the plaintiff's work performance); *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (concluding that supervisor's "contentious oral confrontation" with yelling, "stern words about [plaintiff's] ability to walk" and "words express skepticism regarding [plaintiff's] condition" did not create hostile work environment). Simply put, several jokes regarding Plaintiff's use of a knee scooter, even if true, are not so severe or pervasive to alter the terms and

conditions of Plaintiff's employment or otherwise to constitute disability or age discrimination. Defendants are entitled to summary judgment dismissing this claim.

## IV.    Plaintiff Was Not Treated Differently Because of His Age or Disability.

Mr. Gamble's other miscellaneous claims of discrimination fall short because he lacks admissible evidence that Defendants were responsible for them or that they had anything to do with his age or alleged disability. As set forth above, Plaintiff's Complaint raises a hodgepodge of issues from his employment, including: (1) disagreement with the Bank's calculation of his STD payment; (2) disagreement that his LTD benefits from Prudential ended after 15 months; (3) reassignment of his client accounts to another broker while he was on disability leave and his receipt of partial commission payments; (4) a request that he make a retention loan payment in May 2012; and (5) non-payment of his retention bonus in June 2012.

First, Plaintiff disputes the manner in which the Bank's Disability Services calculated his monthly short-term disability benefit. SUMF, ¶ 81. The Bank paid Plaintiff a monthly benefit that was based upon the salary draw that he earned; Plaintiff believes the monthly benefit should have been based upon his overall compensation, including commissions. *Id.*, ¶¶ 80, 81. Plaintiff concedes he does not know whether this calculation dispute was a result of intentional age or disability discrimination, as opposed to a simple disagreement over how STD benefits are calculated under JP Morgan's Disability Leave Policy. *Id.*, ¶ 90.

Plaintiff also complains that his LTD benefits ended on May 12, 2013, after 15 months. *Id.*, ¶¶ 91, 95, 97. However, decisions related to Plaintiff's LTD were made by Prudential, not Defendants. *Id.*, ¶ 93. Plaintiff has previously filed an ERISA action against Prudential related his LTD, and this Court granted summary judgment for Prudential and dismissed Plaintiff's claims. *Id.*, ¶¶ 98, 99. Plaintiff's LTD has already been litigated.

23

Next, Plaintiff complains that his client accounts were assigned to Frank Villareal for management while he was out of work on his leave of absence. *Id.*, ¶ 100. To compensate Mr. Villareal for his work on the accounts, the Bank implemented a 50-50 commission split between Villareal and Plaintiff on the accounts that Villareal managed for a period of one year. *Id.*, ¶ 101. David Jernigan advised Plaintiff of this commission split in September 2011. *Id.*

Plaintiff agrees that someone needed to manage his clients while he was leave, that managing his clients involved a substantial amount of work, and that a split of commissions to compensate the broker who managed those clients was fair. *Id.*, ¶ 102. Additionally, the Bank's actions were in accordance with its ordinary practice when a financial advisor begins short term disability leave to assign the accounts to another advisor in the same branch so that the Bank's customers receive continuing service during the advisor's leave. *Id.*, ¶ 108. Plaintiff was not singled out. *Id.* And although Plaintiff's claims he stopped receiving the 50 percent commission payments in May 2012, when those payments should have continued September 2012, he has offered no proof that supposed early termination was motivated by his age or disability.[12]

Plaintiff's next complaint that the Bank notified him that he had a retention loan payment overdue is not actionable under the ADEA or ADA. Plaintiff concedes that Defendants have not actively pursued payment of the retention loan obligation, and he has not suffered any financial harm related to the retention loan. *Id.*, ¶ 116.

Finally, Plaintiff's claim that Defendants did not pay him a $27,500 retention bonus in June 2012 is not actionable under the ADEA or ADA. Plaintiff's Retention Agreement clearly states that that payment of the annual retention bonus was "[s]ubject to [his] continued employment in [his] current role as an active employee." *Id.*, ¶ 115. The Retention Agreement

---

[12] Plaintiff has also complained that he was not given the opportunity to sell his "book of business," but he admits that he did not ask the Bank for that opportunity. SUMF, ¶¶ 104, 105.

defined "active employee" as one who is not on leave. *Id.* It is undisputed that Plaintiff had been on leave since August 15, 2011 and was not an active employee in June 2012. *Id.*, ¶ 120. Thus, no retention bonus was owed to him under the Retention Agreement's terms.

## V. Alternatively, Plaintiff's Claims for Back Pay and Front Pay Should Be Dismissed.

"For a back pay award, it is a prerequisite to establish that one is ready, willing, and *able* to work." *Stevens v. Tennessee Valley Authority,* 1986 WL 18134, *5 (6th Cir. Oct. 24, 1986) (emphasis added). When a plaintiff becomes physically unable to work, he is not entitled to lost wages for that period. *See, e.g., Taylor v. Invacare Corp.*, 64 F. App'x. 516, 524 (6th Cir. 2003) (holding that plaintiff was not entitled to front pay, where he was suffering from cancer and unable to lift, and thus it was unlikely that he was able to work in a job similar to the one he had prior to his termination).[13] Plaintiff concedes that since August 15, 2011 (the date his leave of absence began), he has been permanently disabled and unable to work. SUMF, ¶¶ 45-48, 71, 144-145. That remains true today. *Id.*, ¶ 49, 145. The only jobs that Plaintiff has applied for since leaving the Bank are menial positions with several groceries in the Nashville area. *Id.*, ¶ 76. Plaintiff is not entitled to lost wages when he is physically unable to work and has not looked for substantially comparable employment. *Id.*, ¶ 77.

## CONCLUSION

As set forth above, there are no genuine disputes as to any material facts, and Defendants are entitled to judgment as a matter of law as to Plaintiff's claims of age and disability discrimination under the ADEA and ADA. Accordingly, Defendants respectfully move for summary judgment and ask that Plaintiff's action be dismissed with prejudice.

---

[13] *See also Cookenmaster v. Kmart Corp.*, 2009 WL 94532, *3 (E.D. Mich., Jan. 13, 2009) (holding that plaintiff, who had been in a car accident, was not entitled to back pay or front pay for those periods when she was unable to work due to her car accident); *EEOC v. Indep. Stave Co.*, 754 F. Supp. 713, 721 (E.D. Mo. 1991) (plaintiff could not recover back pay where physical injury prevented her from working at alternate job).

25

Respectfully submitted on May 16, 2016.

/s/ Jonathan O. Harris
Jonathan O. Harris (BPR 21508)
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
SunTrust Plaza, Suite 1200
401 Commerce Street
Nashville, Tennessee 37219
(615) 254-1900
(615) 254-1908 (*Facsimile*)
jon.harris@ogletreedeakins.com

Attorney for Defendants, JP Morgan Chase
& Company and J.P. Morgan Securities
LLC

## CERTIFICATE OF SERVICE

I certify that on May 16, 2016, a true and correct copy of the foregoing document has been served ***via the Court's electronic filing service*** upon the following counsel of record for Plaintiff:

Andy L Allman
Andy L. Allman & Associates
131 Saundersville Road, Suite 110
Hendersonville, TN 37075

/s/ Jonathan O. Harris

24825936.1

26