**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| VIRGIL GAMBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:15-cv-0496 |
| | ) | JUDGE CAMPBELL |
| JP MORGAN CHASE & COMPANY, and | ) | |
| J.P. MORGAN SECURITIES LLC, | ) | |
| | ) | |
| Defendants | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court is the Motion for Summary Judgment (Doc. No. 19) filed by defendants JP Morgan Chase & Company ("JP Morgan Chase") and J.P. Morgan Securities LLC ("JPMS") (collectively, "JP Morgan" or "Defendants"). For the reasons set forth herein, the Court will grant the motion and dismiss this action with prejudice.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Virgil Gamble filed his Complaint on April 28, 2015, asserting claims under the Age Discrimination in Employment Act ("ADEA") (Count One) and the Americans with Disabilities Act, as amended ("ADA") (Count Two) based on the termination of his employment and other events. The following facts are undisputed—unless otherwise noted—for purposes of Defendants' Motion for Summary Judgment.

### A.    Plaintiff Takes Medical Leave

Plaintiff Virgil Gamble was employed by JPMorgan Chase Bank (the "Bank") as a Financial Advisor in San Francisco, California. Although employed by the Bank, he was registered with JPMS and licensed through the Financial Industry Regulatory Authority

("FINRA") to offer securities on behalf of JPMS.[1] Plaintiff considered himself to be a stockbroker. In this position, Plaintiff managed client assets and provided investment advice to the Bank's customers. Plaintiff began his employment in the financial industry in 1980. In 2011, when the events giving rise to his lawsuit began, Plaintiff was 68 years old.

On Monday, August 15, 2011, Plaintiff experienced a cardiac event for which he underwent an emergency angioplasty to insert a stent in his heart that same day. Plaintiff had previously suffered two heart attacks; one in October 1989 and one in February 2006. Plaintiff took leave from his position at the Bank beginning on the day of his surgery. Plaintiff informed David Jernigan, the Bank's branch manager for the San Francisco office in which Plaintiff worked, that he would be undergoing a medical procedure. He also communicated with a local human resources representative and a human resources professional in the New York office regarding his need for leave.

On August 29, 2011, Plaintiff provided the Bank with a certification from his cardiologist, Dr. Raymond Erny, stating that Plaintiff was, and would remain, unable to work for an indefinite period of time. Specifically, the letter from Dr. Erny stated: "[A]t this time I have advised [Plaintiff] not to return to his position with JP Morgan Securities, and to take a disability leave given his current cardiac condition." (Doc. No. 22-9, Pl.'s Dep. Ex. 8 (Aug. 24, 2011 Letter from R. Erny to D. Jernigan *et al.*).)

Under JP Morgan's short-term disability plan, Plaintiff was entitled to up to 26 weeks of short-term disability leave. Plaintiff also had concurrent disability coverage through the California State Disability Insurance Fund for a period of 12 months. In addition, Plaintiff had

---

[1] The parties do not explain the relationship between the Bank, JPMS, and JP Morgan Chase. Although Plaintiff originally alleged that he was at times employed by JPMS and was an employee of JP Morgan Chase when his employment ended, he concedes now that he was employed by the Bank. Defendants have not objected to the suit against them on the basis that they did not actually employ Plaintiff

previously purchased a group long-term disability policy through The Prudential Insurance Company of America ("Prudential").

On September 16, 2011, JP Morgan's Disability Management Services approved Plaintiff's application for leave under its Disability Leave Policy for the period of August 15, 2011 through November 7, 2011. Plaintiff's short-term disability leave and benefits were later extended for the maximum 26-week period, through February 13, 2012.

Plaintiff applied for long-term disability benefits through Prudential in January 2012. Prudential approved the application, and Plaintiff received long-term disability benefits for the maximum fifteen-month period provided by his policy, from February 13, 2012 until May 12, 2013. With regard to his employment status after February 13, 2012, Plaintiff understood that he remained on disability leave but had transitioned from short-term to long-term disability leave.

### B.     Plaintiff's Termination

As a Financial Advisor for the Bank, Plaintiff was involved with offering securities, which required that he register and be licensed to sell securities through FINRA. JPMS supervises the activities of each person offering securities on its behalf to ensure compliance with applicable securities law and regulations and with all applicable FINRA rules.

When a securities professional does not maintain his or her continuing education requirements for any reason, JPMS is required to file with FINRA a Form U5 (Uniform Termination Notice for Securities Industry Regulation) to terminate the professional's securities license. Terminating the professional's securities license is necessary as JPMS cannot supervise the professional's activities or ensure that the professional timely completes mandatory continuing education requirements. If JPMS fails to make a timely request for U5 status, then FINRA can fine the company.

In November 2012, Deborah Barragan, Vice President of the Compliance Department for JPMS, learned that Plaintiff was not up to date on his continuing education requirements and that he had taken a leave of absence from his position. Human Resources and Plaintiff's business unit asked Barragan to file a FINRA Form U5 to terminate Plaintiff's securities license with JPMS based on his failure to comply with the continuing education requirements. Barragan did so on December 19, 2012. In section 3 of the Form U5, Barragan stated that the reason for terminating Plaintiff's securities license was his leave of absence. By letter dated December 28, 2012, Barragan provided Plaintiff a copy of the Form U5 that she had filed with FINRA on his behalf.

Although Plaintiff's securities license was placed in U5 status, he could have applied within two years to have it reinstated if he became current with his continuing education requirements. Plaintiff did not contest the termination of his securities license and never sought to have it reinstated.[2]

Plaintiff interpreted the termination of his securities license as the termination of his employment with the Bank. Defendants maintain that Barragan had no authority to terminate Plaintiff. Defendants contend, instead, that Plaintiff's termination was not processed until September 2013, after Plaintiff failed to respond to at least two letters and several phone calls from Jennifer Smith, the Bank's Vice President and Human Resources Business Partner, attempting to inquire about Plaintiff's leave status and intentions to return to work. Plaintiff

_____

[2] In his Response to Defendants' Statement of Undisputed Facts, Plaintiff avers, without citation to any evidence in the record, that neither Barragan nor anyone else at JPMS notified him in advance that he was due to complete continuing education courses in order to maintain his securities license and that, "[h]ad Plaintiff been aware that his continuing education courses were due, Plaintiff could have completed these courses online remotely from his home." (Doc. No. 35, Resp. to ¶ 54.) Because this response, like many others in Plaintiff's Response to the Statement of Undisputed Facts, is not supported by evidence in the record and therefore does not comply with Local Rule 56.01(c) or Fed. R. Civ. P. 56(c)(1)(A), the Court disregards it. Moreover, Plaintiff has not pointed to any evidence suggesting that JPMS had an obligation to notify him of his ongoing responsibility to comply with the continuing education requirement for maintaining his securities license.

disputes having received the letters or telephone calls from Jennifer Smith, but he does not dispute that his termination was processed in September 2013.

### C. Plaintiff's Purported Request for a Reasonable Accommodation

As detailed below in the context of the analysis of Plaintiff's ADA claim, Plaintiff has stated and testified repeatedly that he has been completely and permanently disabled from performing any work since August 15, 2011. He nonetheless attempts to show that he requested to return to work with accommodations in March 2013. In his response to the Defendants' Statement of Undisputed Facts, he alleges that his attorney sent a letter to Jeanne Austria, Assistant Vice President for Human Resources at JP Morgan Chase in New York, dated March 19, 2013, and, after receiving no response to that letter, a follow-up letter dated June 24, 2013. (Doc. No. 35, at ¶ 75.) Plaintiff does not cite to or provide the affidavit of his attorney in support of that statement. Instead, Plaintiff attached unverified, unauthenticated copies of counsel's letters as an exhibit to his Response. In the March 19, 2013 letter, Plaintiff's attorney purportedly stated:

> Your letter [of March 13, 2013] prematurely assumes Mr. Gamble may not be returning to work because of his disability. Mr. Gamble's medical condition does not prevent him from returning to work but may require certain accommodations under the Americans with Disabilit[ies] Act As Amended. Mr. Gamble's treating physicians are concerned with certain stressors in the workplace which may exacerbate his condition. We are therefor[e] making a formal request that you engage in the interactive process to assess what reasonable accommodations can be made for Mr. Gamble's return to work. Please contact me at your earliest convenience.

(Doc. No. 35-1, at 2.) Plaintiff asserts that Defendants never contacted him or his attorney in response to that letter or a follow-up letter dated June 24, 2013. (Doc. No. 35-1, at 3.)

Defendants have established that Plaintiff did not identify these letters in his Rule 26 Initial Disclosures or produce or identify them in response to discovery requests. (*See* Doc. Nos.

37-2 (Harris Aff.), 37-1 and 37-3 (Exs. to Harris Aff.).)

**D.    Other Allegedly Discriminatory Acts**

Plaintiff contends that Defendants took a variety of other actions, in addition to terminating his employment, that constituted discrimination on the basis of age or disability.

First, Plaintiff alleges that, between December 2009 and July 2011, Plaintiff was involved in four automobile accidents, in the course of which Plaintiff suffered physical injuries to his back and the right side of his body, including his foot, knee, hip, shoulder, and neck. As a result of these injuries, Plaintiff was using a knee scooter for mobility when he returned to work during the summer of 2011. During that period, also as a result of his injuries, Plaintiff was able to work only part-time and could not do all the things necessary to develop business and increase the client assets that he managed.

David Jernigan became branch manager of the Bank's San Francisco office where Plaintiff worked on July 1, 2011. Plaintiff alleges that Jernigan made jokes in front of others about Plaintiff's use of the knee-scooter "several times" during July and August 2011 (Doc. No. 22-1, Pl.'s Dep. 69:14), causing others to laugh and embarrassing Plaintiff. Plaintiff was offended by Jernigan's "jokes," but he did not report them to the Bank's Human Resources department.

On August 12, 2011, Plaintiff had a meeting with Jernigan during which Jernigan advised Plaintiff that he needed to grow his client assets. Plaintiff explained to Jernigan that he had had his "latest" heart attack in 2006 (Pl.'s Dep. at 41:11) and that his cardiac condition, in combination with the injuries sustained in the car accidents, rendered him unable to work the same number of hours that he used to. Plaintiff told Jernigan that he was still only able to work part-time and that, until he was fully recovered from these accidents, he could not do more than

he already was. At that point, Jernigan told Plaintiff that he thought he should resign. Plaintiff refused to resign, and Jernigan told Plaintiff that he was not "going to run [Plaintiff] off" but that Plaintiff should take the weekend to "think about it." (Pl.'s Dep. 42:11–12.) Plaintiff suffered his August 15, 2011 cardiac event shortly after that conversation and never returned to work.

Plaintiff also complains that, shortly after he took medical leave, David Jernigan told Plaintiff that his accounts would be given to Frank Villareal, a younger employee, and that the Bank would pay Plaintiff fifty percent of the commissions earned on those accounts for one year (through September 2012). Plaintiff contends that this was unusual because (1) brokers were typically allowed to sell their books but Plaintiff was not offered that opportunity; and (2) the commission payments he was promised stopped in May 2012 instead of September 2012 as promised.

Plaintiff contends that Jernigan's behavior toward him was harassing and constituted age and/or disability discrimination.

Next, Plaintiff alleges that the Bank incorrectly calculated his short-term disability payments for the period of August 15, 2011 through February 12, 2012. Plaintiff appealed the calculation of his benefits to the JP Morgan Chase Disability Management Services Appeals Coordinator. The calculation was upheld on appeal, and Plaintiff was notified that he could file a lawsuit under the Employee Retirement Income Security Act of 1974 ("ERISA") to challenge the Bank's decision related to his short-term disability benefits. Plaintiff did not pursue a claim under ERISA related to his short-term disability benefits.

Plaintiff also complains that the Bank improperly sought repayment of a retention loan while Plaintiff was on disability leave. Plaintiff received this retention loan in the amount of $142,759.08 from JP Morgan in June 2008. Pursuant to a promissory note Plaintiff executed in

connection with the loan, annual payments on the loan were due annually on the 11th of June from 2009 through 2015. In addition, during his employment, Plaintiff was entitled to receive annual retention bonus payments in the gross amount of $30,000, minus applicable deductions and holdings.

The terms of the retention loan and retention bonus were set forth in a retention agreement executed by Plaintiff on May 7, 2008. The loan repayments were to be forgiven in the event of disability or death. In addition, if Plaintiff's employment terminated for any reason, JP Morgan's obligation to pay the retention bonus would be cancelled. On May 30, 2012, the Bank informed Plaintiff that his retention loan payment was past due. Plaintiff concedes that the Bank, apart from this one letter, never pursued efforts to collect the retention loan, and Plaintiff did not suffer any financial harm related to the retention loan.

Plaintiff complains that he did not receive his retention bonus in June 2012. Defendants' position is that the Bank did not owe the retention bonus because Plaintiff was on long-term disability leave and was not an active JP Morgan employee as of June 2012.

Finally, Plaintiff attempts to blame Defendants for Prudential's termination of his long-term disability benefits in May 2013, after the maximum 15 months to which he was entitled under the policy. Plaintiff believes that he should have been entitled to long-term disability benefits for life. However, Plaintiff conceded in his deposition that decisions regarding Plaintiff's long-term disability benefits were made solely by Prudential. (Pl.'s Dep. 61:18–62:1.)[3]

---

[3] In his Response to Defendants' Statement of Undisputed Facts, Plaintiff attempts to deny that fact, stating: "Denied. Defendant, along with Prudential, structured the terms of the policy, which were never disclosed to Plaintiff and were discriminatory based on age." (Doc. No. 35, at ¶ 93.) Because this response, like many others, does not comply with Local Rule 56.01(c) Fed. R. Civ. P. 56(c)(1)(A), and because it conflicts with his deposition testimony, the Court disregards it.

Further confirming Plaintiff's understanding that long-term disability benefits were

E.    **Plaintiff's California Lawsuit**

Plaintiff filed a lawsuit in the Superior Court of California for the County of Marin in connection with the four automobile accidents that took place between 2009 and 2011, *Gamble v. Keil*, No. CIV-1102226 (the "California lawsuit"). On April 3, 2012, Plaintiff gave deposition testimony as a part of the California lawsuit, and he testified truthfully during that deposition (the "California deposition"). (Pl.'s Dep. 29:14–30:1; Doc. No. 22-5, Pl.'s Dep. Ex. 4.) On March 15, 2013, Plaintiff provided responses to written interrogatories served on Plaintiff by the defendant in the California lawsuit . (Doc. No. 22-4, Pl.'s Dep. Ex. 3.) Plaintiff stated in his deposition in the case before this Court that he answered the California interrogatories truthfully. (Pl.'s Dep. 17:15–17.)

Plaintiff testified in the California deposition and averred in his interrogatories responses in the California lawsuit that he was totally and permanently disabled.

F.    **EEOC Charge**

On September 24 2013, Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") and the Tennessee Human Rights Commission; Plaintiff also submitted an EEOC Intake Questionnaire and attached a narrative of the actions that he viewed to be discriminatory. (Doc. No. 22-3, Pl.'s Dep. Ex. 3 (Charge and Amended Charge); Doc. No. 23-5, Pl.'s Dep. Ex. 15 (A. Allman Letter and Intake Questionnaire).) Plaintiff was represented by counsel when he filed the EEOC Charge. The

---

controlled by Prudential, in May 2014, Plaintiff filed a complaint against Prudential in the Davidson County Chancery Court alleging breach of contract and bad-faith denial of benefits after May 12, 2013. Prudential removed the action to the United States District Court for the Middle District of Tennessee. On May 18, 2015, Senior Judge William J. Haynes, Jr. granted Prudential's motion for summary judgment in that action, finding that Prudential's interpretation of the long-term disability policy as limiting benefits to fifteen months was neither arbitrary nor capricious. *Gamble v. Prudential Disab. Ins. Co.*, No. 3:14-cv-01297, 2015 WL 2374091 (M.D. Tenn. May 18, 2015).

Charge alleges that Defendants engaged in discrimination on the basis of age and disability from August 2011 through December 19, 2012.

## II.    SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). A fact is material if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the Court that demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp.*, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Van Gorder v. Grand Trunk W.R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson*, 477 U.S. at 249. The Court determines whether

sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to defeat summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. *Id.* at 251.

## III.    ANALYSIS AND DISCUSSION

### A.    The ADA Claim

The ADA, as amended, makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). When a plaintiff lacks direct evidence of discrimination, his claim under the ADA is subject to the familiar burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Under *McDonnell Douglas*, the plaintiff must establish a *prima facie* case of discrimination. If the plaintiff fails to do so, his claim must be dismissed. Only if he presents evidence to support a *prima facie* case does the burden shift to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual. *Id.*; *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

To establish a *prima facie* case of ADA discrimination, the plaintiff must show that (1) he is disabled; (2) he is otherwise qualified for the position, with or without a reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) either the position remained open, the employee was replaced by a non-disabled person, or similarly situated non-disabled employees

were treated more favorably. *Whitfield*, 639 F.3d at 259.

In this case, Defendants argue that Plaintiff cannot establish a *prima facie* ADA claim based on his termination because he cannot show that he was "qualified" for the position at the time of his termination or that he requested a reasonable accommodation. As set forth below, the Court agrees and therefore does not reach Defendants' arguments regarding their legitimate, non-discriminatory reason for Plaintiff's termination.

### 1. *Qualification for the Position*

Under the ADA, a "qualified individual" is a person "who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Actually working is an essential function of any job. *See Schroeder v. Schroeder*, No. 3:05 CV 7093, 2005 WL 1389217, at *3 (N.D. Ohio June 13, 2005) (citations omitted) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." (quoting *Tyndall v. Nat'l Educ. Ctrs. Inc.*, 31 F.3d 209, 213 (4th Cir.1994))). Thus, a plaintiff who has not been medically released to return to work in any capacity is not "qualified" under the ADA. *Roberson v. Cendant Travel Servs., Inc.*, 252 F. Supp. 2d 573, 583 (M.D. Tenn. 2002)); *see also Anderson v. Inland Paperboard & Packaging, Inc.*, 11 F. App'x 432, 438 (6th Cir. 2001) ("The second element of a *prima facie* case under the ADA is the requirement that a plaintiff be able to perform the essential functions of her job. [Plaintiff's] doctor, however, had not yet given her permission to return to work when her employment . . . was terminated in February of 1998. Accordingly, she was unable to perform her duties as a storeroom clerk."); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("[B]ecause [the plaintiff] was not released by her doctor to return to work, she has not met the second requirement that she be

qualified to perform the essential functions of the job.").

The time period relevant to a determination of whether a plaintiff is a "qualified individual" is the time of discharge. *Aston v. Tapco Int'l Corp.*, 631 F. App'x 292, 297 (6th Cir. 2015). In this case, Plaintiff insists that his employment was effectively terminated when JPMS terminated his securities license in December 2012. Defendants maintain that Plaintiff was not terminated until September 2013, after Plaintiff failed to respond to inquiries regarding his intention to return to work. Regardless of which date applies, the record is replete with testimony and documentation establishing that Plaintiff was never medically released to return to work and that he considered himself completely and permanently disabled from work from sometime shortly after August 15, 2011 up through at least the date of his January 7, 2016 deposition in this action.

As set forth above, Plaintiff suffered his third heart attack and underwent an emergency angioplasty on August 15, 2011. Plaintiff began a leave of absence from his position at the Bank that day. Following the angioplasty, Plaintiff's cardiologist, Dr. Raymond Erny, advised Plaintiff that he should take an indefinite leave of absence from his job for medical reasons, and Dr. Erny conveyed that recommendation to the Bank in a letter dated August 24, 2011. (Doc. No. 22-9, Pl.'s Dep. Ex. 8.) The Bank initially granted Plaintiff 26 weeks of paid short-term disability leave, from August 15, 2011 through February 13, 2012. Plaintiff testified during his deposition that, at some point during his six months of short-term disability leave, he decided that it was in his best interest, for health reasons, not to return to his job:

> Q     When did you make a final decision that it's in my best medical interest to just not be a stockbroker again?
>
> A     I think during that six-month period of time.

(Pl.'s Dep. 58:24–59:3.) That decision was based on his cardiologist's medical advice. (Pl.'s

Dep. 59:4–6.)

Consistent with that decision, Plaintiff transitioned from short-term to long-term disability leave in February 2012. He was granted long-term disability benefits from February 13, 2012 until May 12, 2013. (*See* Doc. No. 24-1, Pl.'s Dep. Ex. 25, Jan. 13, 2012 Letter from Prudential to V. Gamble.)

In the spring of 2012, after he had transitioned from short-term to long-term disability, Plaintiff testified in the deposition he gave in the California lawsuit that he was "totally disabled" from working due to his heart condition:

> Q.     Are you still working for J. P. Morgan Securities?
>
> A.     Technically, no.
>
> Q.     Why do you qualify that with "technically"?
>
> A.     I am totally disabled; but during the disability period, I'm still considered an active employee for a period of time.
>
> Q.     What is the nature of the disability that prevents you from working now?
>
> A.     Heart disease.

(Doc. No. 22-5, Pl.'s Dep. Ex. 4 (Cal. Dep. 8:11–19).) In the same deposition, Plaintiff reaffirmed that this total disability was "permanent":

> Q.     Did Dr. Erny or any other health professional tell you you could not return to work after August 15, 2011?
>
> A.     Dr. Erny.
>
> Q.     As far as you know, will your cardiological condition permanently disable you from work?
>
> A.     Yes.

(*Id.* 64:8–13.)

When JPMS terminated Plaintiff's securities license in December 2012, Plaintiff did not

contest that termination or seek reinstatement of his license. Instead, he wrote a letter to John Leclercq, Claim Representative for Prudential, dated January 23, 2013, reconfirming that he was permanently disabled. In that letter, written in response to notification from Prudential that his long-term disability payments would terminate effective May 13, 2013, Plaintiff stated:

> This advice [regarding the termination of benefits] was shocking and surprising as it has always been my impression that these payments would continue for the rest of my life. . . .
>
> Your continuation of my monthly disability benefits during my lifetime are expected without delay, interruption or reduction, *as I continue to be disabled and unable to perform the duties that I was performing*.

(Doc. No. 24-2, Pl.'s Dep. Ex. 26 (emphasis added).)

On March 15, 2013, Plaintiff submitted sworn interrogatories in connection with the California lawsuit, providing information about his ongoing physical condition:

> Plaintiff suffers from constant pain and aching in his neck, radiating into his right shoulder, unchanging. . . . Plaintiff suffers from constant pain in his right foot which is also unchanging. Plaintiff also suffers from lower back pain, which is progressive in nature and duration. Plaintiff suffers from constant pain in his right hip and right knee. Plaintiff is also unable to exercise as a result of his injury which in turn he alleges and believes had had a deleterious effect on his heart.

(Doc. No. 22-4, Pl.'s Dep. Ex. 3 (California lawsuit, Pl.'s Resp. to Interrog. 6.3).) Plaintiff stated that he had not been released from treatment for his injuries. (*Id.*, Resp. to Interrog. 6.7.) Plaintiff indicated that, as a result of these injuries, he was completely disabled from work and did not anticipate returning to the work force:

> Plaintiff . . . believes . . . that his inability to exercise has had a deleterious effect on his heart which has rendered him incapable of working part [sic] August.
>
> . . . .
>
> Plaintiff is informed and thereon believe that his inability to exercise has had a significant deleterious effect on his heart condition which renders him incapable of working for another 20 years, as Mr. Gamble had previously planned as he is a single man with no family in the area and loved his career.

(*Id.*, Resp. to Interrogs. 8.7, 8.8; *see also* Pl.'s Dep. 26:16–27:18 (discussing interrogatory responses).) Finally, Plaintiff stated that he was seeking damages for future loss of earnings in that lawsuit because "he is no longer able to work" as a result of his heart condition and the injuries sustained in the car accidents. (*Id.*, Resp. to Interrog. 17.1 and Request for Admission 29.)

Likewise, Plaintiff testified in his deposition in this action that he was physically unable to return to work as of August 2013:

> Q      But as of [August 2013] you couldn't physically work even if you wanted to, right?
>
> A      No.

(Pl.'s Dep. 65:24–66:1.) Plaintiff further confirmed that, as of the date of his deposition, he remained unable to work:

> Q      And as far as unable to work, the fact that you are disabled and unable to work in the future, does that remain true as we sit here today?
>
> A      Yes.

(Pl.'s Dep. at 24:20–23.)[4] There is no indication in the record that Plaintiff experienced any kind of medical reprieve between August 2011 and his January 2016 deposition or that there was some period during that timeframe when he would have been able to work.

In sum, Defendants have established as a matter of undisputed fact that, based on Plaintiff's own testimony in this case and in the California lawsuit, that Plaintiff was totally

---

[4] When asked whether there was any job he felt he could do that would conform with his physician's restrictions, as of the date of his deposition, Plaintiff replied that he thought he could "maybe" work as "an expert witness in the securities industry." (Pl.'s Dep. 25:8–9.) The court does not consider this vague assertion to give rise to a disputed question of fact regarding Plaintiff's ability to work in any capacity at the time of his termination (in either December 2012 or September 2013).

disabled from working in any capacity beginning August 15, 2011 and that he remained totally disabled as of the date his securities license was terminated in December 2012 and as of September 9, 2013, the date the Bank processed the termination of his employment. Because he was unable to perform any work, Plaintiff was not a "qualified individual" for purposes of his ADA claim. Defendants' motion for summary judgment on Plaintiff's ADA claim, based on wrongful termination, will be granted on that basis.

### 2.     *Failure to Accommodate*

Because the record establishes that Plaintiff was unable to work in any capacity, no accommodation would have been possible and the failure-to-accommodate claim necessarily fails as well. *See Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007) (noting that a *prima facie* case of disability discrimination based on failure to accommodate requires the plaintiff to establish that he is "otherwise qualified" for the position despite his disability "(a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation"). In the alternative, the Court finds that the claim is defeated because Plaintiff did not make a request for a reasonable accommodation.

Discrimination under the ADA includes an employer's failure to make "reasonable accommodations[5] to the known physical or mental limitations of an otherwise qualified individual who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." 42 U.S.C. § 12112(b)(5)(A); *Kleiber*, 485 F.3d at 868. A disabled employee who requires an accommodation "is saddled with the burden of proposing an accommodation

---

[5] Under the ADA, "reasonable accommodation" includes "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

and proving that it is reasonable." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010). *See also Rorrer v. City of Stow*, 743 F.3d 1025, 1040–41 (6th Cir. 2014) (noting that an employer cannot be liable for failing to engage in the mandatory "individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position" unless the plaintiff first establishes "that he proposed a reasonable accommodation").

The question here is whether Plaintiff ever requested an accommodation. In their Statement of Undisputed Facts, Defendants aver that "neither Plaintiff nor his attorney asked the Bank to place him in another position so he could return to work." (Doc. No. 21, ¶ 75 (citing Doc. No. 24-9, Smith Decl. ¶ 15).) Plaintiff purports to deny that statement by asserting that his attorney requested a reasonable accommodation. He does not cite to the affidavit of counsel or any other admissible evidence in the record to support that claim. Instead, he attached to his Response to Defendants' Statement of Undisputed Facts two unverified, unauthenticated letters, dated March 19, 2013 and June 24, 2013.

Under Rule 56 of the Federal Rules of Civil Procedure, a party may object to material relied upon by the other party on the basis that it is not presented in a form that is admissible into evidence. Fed. R. Civ. P. 56(c)(2). Defendants have properly objected to Plaintiff's introduction of the March 19, 2013 and June 24, 2013 letters on the basis that Plaintiff did not identify these letters in his initial disclosures and did not produce them in discovery. In support of this argument, Defendants have submitted the declaration of attorney Jonathon O. Harris and verified copies of Plaintiff's Initial Disclosures and responses to written discovery. These documents establish that the letters attached to Plaintiff's Response to Defendants' Statement of Undisputed Facts were not identified or produced at the appropriate time.

Rule 26(a)(1)(A)(ii) of the Federal Rules of Civil Procedure provides that a party "must,

without awaiting a discovery request, provide to the other parties . . . a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 26(e) governs the parties' responsibility to supplement and correct initial disclosures and discovery responses.

"If a party fails to provide information . . . as required by Rule 26(a) or (e), the party *is not allowed to use that information* . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[T]he language of Rule 37 suggests that such exclusion is mandatory, not merely authorized, absent harmlessness or justification . . . ." *Caudell v. City of Loveland*, 226 F. App'x 479, 481 n.1 (6th Cir. 2007 (citing *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004); *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004)).

Plaintiff has not sought to respond to Defendants' assertions regarding his failure to produce the purported letters in his initial disclosures or in discovery. He has not attempted to justify his omission or show that it is harmless. On the basis of Plaintiff's failure to disclose these letters at any time prior to Plaintiff's Response to the Motion for Summary Judgment, the Court will exclude the letters from consideration in ruling on Defendants' motion.

Apart from these letters, Plaintiff has pointed to no evidence to support his claim that he requested an accommodation or ever indicated a desire or intent to return to work. Because Plaintiff never requested an accommodation, his ADA claim based on Defendants' failure to accommodate is subject to summary judgment on this basis as well.[6]

---

[6] The Court observes that the date of the letter in which Plaintiff's counsel purportedly requested an accommodation, March 19, 2013, corresponds closely with the March 15, 2013 date of Plaintiff's discovery responses in the California lawsuit, in which he attested, under oath, that he was "incapable of working for another 20 years" (Doc. No. 22-4, Pl.'s Dep. Ex. 3 (California

## B.  The ADEA Claim

The ADEA prohibits an employer from discharging an employee who is at least forty years old "because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631. Under § 623(a)(1), "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). As with claims under the ADA, courts apply the familiar *McDonnell Douglas* framework to ADEA cases in which there is no direct evidence of age discrimination. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (acknowledging *Gross* and applying *McDonnell Douglas*).  To establish a *prima facie* case of age discrimination for purposes of the first step of that framework, an employee must demonstrate that he or she was (1) was a member of a protected age class (*i.e.*, at least forty years old); (2) subjected to an adverse employment action; (3) otherwise qualified for the job or promotion; and (4) replaced by a younger employee, or that similarly situated younger employees were treated more favorably. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007).

In this case, there is no dispute that Plaintiff satisfies the age element of his *prima facie* case. Defendants also do not dispute, for purposes of their motion for summary judgment, that Plaintiff suffered an adverse employment action when his employment was terminated. They argue, however, that Plaintiff fails to establish that he was "otherwise qualified" for the position, for the same reasons that he was not "qualified" for the position for purposes of his disability-discrimination claim.

The Sixth Circuit has noted that whether an individual is qualified for his position is not

---

lawsuit, Pl.'s Resp. to Interrogs. 8.7, 8.8)) and that he was "no longer able to work" as a result of his heart condition and the injuries sustained in the car accidents. (*Id.*, Resp. to Interrog. 17.1 and Request for Admission 29.)

meant to be an onerous test: "At the *prima facie* stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir. 2003). Thus, "a plaintiff can show that she is qualified by presenting 'credible evidence that she continued to possess the objective qualifications she held when she was hired." *Id.* (quoting *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991)). Generally, "the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.*

In addition, however, the question of whether an employee is *medically* capable of continuing to perform the job may also be dispositive. *See, e.g.*, *Hile v. Pepsi-Cola General Bottlers, Inc.*, 108 F.3d 1377 (Table), 1997 WL 112404, at *4, *6 (6th Cir. March 12, 1997) (affirming summary judgment for the defendant on the plaintiff's ADEA and ADA claims based on the plaintiff's admitted physical inability to perform essential job functions); *Hart v. Ridge Tool Co.*, 544 F. Supp. 2d 634, 643 (N.D. Ohio 2008) (finding that the plaintiff, due to his medical condition, was "unable to perform essential job functions" and therefore could not establish that he was qualified for the position from which he was terminated for purposes of ADA or ADEA *prima facie* case).

In this case, as set forth above, the record establishes that Plaintiff was not otherwise qualified for his prior position as a stockbroker for purposes of his ADEA claim, because he was medically incapable of working. Plaintiff has stated and testified on numerous occasions that his physician has never released him to return to work and that he remained completely disabled from work as of December 2012 when JPMS terminated his securities license and in September 2013 when the Bank processed his termination. Because Plaintiff has failed to establish that he is

otherwise qualified for the job, Defendants are entitled to summary judgment in their favor on Plaintiff's ADEA claim as well.

### C. The Statute of Limitations

Plaintiff claims that a variety of other events were also discriminatory on the basis of his age and disability. These events include the following: (1) in July and August 2011, David Jernigan made derogatory and harassing comments to Plaintiff about his medical condition in the presence of co-workers, and on August 12, 2011, told Plaintiff that he should consider retiring; (2) Jernigan represented to him in fall of 2011 that the Bank would pay him fifty percent of the commissions earned on his accounts that were being serviced by another employee while Plaintiff was on leave, for a period of one year, but the payments stopped prematurely in May 2012 rather than September 2012, and in any event, Plaintiff should have been given the opportunity to sell his accounts; (3) JP Morgan incorrectly calculated the amount of Plaintiff's short-term disability benefits from September 2011 through February 2012; (4) on May 30, 2012, the Bank informed Plaintiff that his retention loan payment was past due, but the loan was supposed to be forgiven in the event of disability or death; and (5) in June 2012, Plaintiff did not receive an annual retention bonus.

These events all transpired between July 2011 and June 2012. Defendants argue that any claims of age or disability discrimination based on these events are time-barred, because Plaintiff's EEOC charge was filed more than 300 days after these events occurred. Plaintiff contends that the "continuing violation doctrine provides that where there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." (Doc. No. 34, at 12 (citation omitted).)

There is no dispute that Plaintiff filed his discrimination Charge with the EEOC and the Tennessee Human Rights Commission on September 24, 2013. His discrimination claims are subject to a 300-day limitation period. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375–76 (6th Cir. 2002) (noting that Tennessee is a "deferral" state, so the plaintiff's ADEA claim was subject to a 300-day limitations period). Consequently, claims based on events that took place more than 300 days prior to September 24, 2013—that is, before November 28, 2012—are time-barred, unless the limitations period is tolled. "The continuing-violations theory is a specific equitable doctrine that [may toll] this filing period." *Auston v. City of Clarksville*, 244 F. App'x 639, 647 (6th Cir. 2007).

The continuing-violation doctrine provides that violations that "occur beyond the limitations period are actionable where a plaintiff challenges not just one incident of unlawful conduct but an unlawful practice that continues into the limitations period." *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir. 1992) (internal quotation marks and alterations omitted). In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the Supreme Court significantly curtailed the application of the continuing-violation doctrine in the context of employment discrimination claims when it held that held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."

In *Morgan*, the Supreme Court recognized that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. The Court held that a plaintiff could "only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.* The Court found that the plaintiff's allegations of wrongful suspension, being charged with a rule violation,

denial of training, and a false accusation of threatening a manager all related to "discrete discriminatory acts." *Id.* Because these acts had occurred more than 300 days before the plaintiff filed his EEOC charge, claims based upon them were time-barred.

The continuing-violations doctrine does not apply to Plaintiff's claims in this case. His termination in December 2012 (or September 2013) was a discrete act subject to its own statute of limitations. The claim based on termination was filed within the statute of limitations. All of the other acts that Plaintiff complains about, however, took place well before November 2012 and are unrelated to his termination. Claims based on these events are therefore barred by the 300-day limitations period.

### D.     The Termination of Long-Term Disability Benefits

Plaintiff also contends that Defendants improperly terminated his long-term disability benefits in May 2013 and that this constituted a discriminatory act. A claim based on that action is not barred by the statute of limitations, but it is barred for other reasons. First, it is outside the scope of Plaintiff's EEOC Charge. In the Charge and Intake Questionnaire, Plaintiff clearly stated that the last date upon which any event giving rise to a claim of discrimination occurred was December 19, 2012. (Doc. No. 22-3, at 1, 2 (Charge and Am. Charge); Doc. No. 23-5, at 7 (Intake Questionnaire).) And a claim related to the termination of long-term disability benefits would not reasonably be expected to arise out of Plaintiff's termination in December 2012. The Court therefore lacks subject-matter jurisdiction over the claim based on the termination of Plaintiff's long-term disability benefits in May 2013. *See Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853 (6th Cir. 2000) ("Federal courts do not have subject matter jurisdiction of [ADA] claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge.").

Even if that were not the case, Plaintiff offers no concrete evidence—apart from his unsubstantiated opinion—suggesting that Defendants had any control over the duration of Plaintiff's long-term benefits. Plaintiff conceded in his deposition that decisions relating to his long-term disability benefits were solely within the control of Prudential. Plaintiff litigated Prudential's decision to terminate benefits in May 2013, and this Court upheld that decision. *Gamble v. Prudential Disab. Ins. Co.*, No. 3:14-cv-01297, 2015 WL 2374091 (M.D. Tenn. May 18, 2015) (Haynes, S.J.). Plaintiff has no basis for asserting that Prudential's decision to terminate benefits constituted discrimination by Defendants.

Defendants are therefore also entitled to summary judgment on Plaintiff's discrimination claim based on the termination of his long-term disability benefits.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and dismiss this action in its entirety. An appropriate order is filed herewith.


_____
TODD CAMPBELL
UNITED STATES DISTRICT JUDGE